SALLIE WALLACE *v.* THE STATE.

1. MURDER — INDICTMENT — EVIDENCE.— An averment in an indictment for infanticide that the deceased infant was a female is of that class of averments known as descriptive, and it was incumbent on the State to prove it.

2. HOMICIDE, as defined by the Penal Code of this State, " is the destruction of one human being by the act, agency, procurement, or culpable omission of another; " but it is further provided that the person upon whom the homicide is alleged to have been committed " must be in existence by actual birth." An infant cannot be the subject of homicide until its complete expulsion, alive, from the body of its mother.

3. INFANTICIDE — EVIDENCE.— Physiology and obstetrics have established the position that the respiration of a child, after the parturition is complete, demonstrates that the circulation of its blood is independent of its mother, and shows its individual existence. But, as respiration may occur before the parturition is complete, it does not of itself suffice to prove the independent circulation and individual existence of the child. See the opinion *in extenso* on this subject.

4. SAME.— Note evidence which, in a trial for infanticide, is held insufficient to prove the existence of the child independent of its mother at the time the violence was inflicted upon it.

APPEAL from the District Court of McLennan. Tried below before the Hon. L. C. ALEXANDER.

The present appeal is the third taken by the appellant from convictions for murder in the second degree, with a term of five years in the penitentiary assessed as the punishment by each of the verdicts. In the 7th and the 9th volumes of these Reports, at pages 570 and 299, respectively, the case will be found as reported upon the former adjudications in this court; and in the former of these volumes will be found a condensed statement of the evidence material to the case as then presented.

The evidence in the present record is more full and elaborate than that brought up in the former ones, especially upon the important physiological questions dis-

cussed in the opinion, and a detail of it is now required by the ruling that it is insufficient to establish affirmatively the independent existence of the infant.

The indictment was filed May 8, 1879, and charged that Sallie Wallace, on the 21st of the preceding March, being big with a female child, "did bring forth said child alive, of the body of her the said Sallie Wallace, alone and in secret, and, said female child being then and there alive, the said Sallie Wallace, on the said 21st day of March, A. D. 1879, as soon as the said child was born, said child then and there being alive as aforesaid, with force and arms did then and there, in and upon the said female child, unlawfully, wilfully and feloniously, and of her malice aforethought, make an assault; and that the said Sallie Wallace, with both her hands about and around the neck of her the said female child, then and there a strong domestic string, of no value, unlawfully, wilfully and feloniously, and of her malice aforethought, did fix, tie and fasten; and that the said Sallie, with the domestic string aforesaid, fixed, tied and fastened as aforesaid, her the said female child unlawfully, wilfully, feloniously and of her malice aforethought, did choke, suffocate and strangle; of which choking, suffocating and strangling she the said female child then and there instantly died; and so the grand jurors aforesaid, on their oath aforesaid, do say that the said Sallie Wallace her said female child in manner and form aforesaid unlawfully, wilfully, feloniously and of her malice aforethought did kill and murder; contrary," etc. The trial resulting in the present appeal was had on December 21, 1880, and the record on the appeal was sent to the Galveston branch of this court at the instance of the counsel for the State.

The first witness examined by the prosecution in the court below was Elizabeth Williams, a colored woman, who, with her husband Cæsar Williams, lived at Robinsonville, a village in McLennan county, about six miles

south of Waco.   She testified that one Thursday evening on or about March 20, 1879, the defendant, a colored woman, who was then a stranger to witness, came to her house, walking and barefooted.   She told witness that her name was Sallie Wallace, and stayed for supper, but ate little.   At bed-time she said she believed she would spend the night with witness, who arranged a bed for her, and she retired.   When, about daylight the next morning, witness called to the children, the defendant answered and said she would get up and go over to Mrs. Weekly's, a neighbor.   She went out but returned after a while.   At breakfast, about sunrise, she took a little coffee, but would eat nothing else.   Near the bed occupied by the defendant, witness noticed a spot of clotted blood, and had defendant to clean it up.   After breakfast, witness' husband went off to his day's work, and witness went to the cowpen, accompanied by the defendant.   When witness had about finished milking, the defendant said she believed she would go down to a branch which was about a hundred yards distant, and look for a hen's nest Mrs. Weekly had given her if she could find it.   She left witness, who, in about half an hour, saw her head above some bushes near the branch.   This was the last seen of the defendant by witness until some three months afterwards, when witness was called to testify at the first trial of this case. The defendant, when at witness' house, had a full breast and belly, showing every indication of pregnancy.   At the cow-pen her appearance indicated the early stages of labor, as the upper portion of her belly seemed to be sinking and the lower protruding.   Witness told her she was in no fix to be away from her mother, and ought to go home at once; to which she replied that she was going home, and that she supposed all young women had to get in that condition at some period of their lives.   When witness returned from the cow-pen to the house she found that the bed where defendant slept was bloody, as well as

the floor near it. Both of the sheets were stained with blood. The next day, about two or three o'clock, witness and Fannie Mucker went down upon the branch, and at the spot where witness had seen the defendant's head they discovered the body of a fat, plump, full-termed, little colored child. They raised an alarm which brought nearly everybody in the village down to see the child. It lay in a little scratched-out place, and some leaves and sand had been thrown around it. It was lying on its back, with its eyes slightly open, and something had eaten a portion of its cheek. It was a large, mature, well developed child, with a full head of hair and well matured finger nails. Around its neck was tied a strong string made out of a piece of domestic. The string had been passed twice round the neck, and tied in a knot behind the neck. Close by lay the afterbirth, and also an apron which the defendant had on at witness' house.

Cæsar Williams, for the State, corroborated the testimony of his wife in many particulars. He and many others viewed the body as it lay where it had been found, and he gave a very similar description of it to that given by his wife. He added that the string was very tight around the child's neck, and that the apron found near it, and previously worn by the defendant, was made out of blue checked domestic. He covered the body with a tub, and went to Waco for the coroner, who came out the next day and held an inquest.

Albert Cole, for the State, testified that he saw the defendant one Friday night in March, 1879, at her mother's house in McLennan county. She was sick, and witness supposed she had had a child. She had been arrested, and he was employed by a constable to guard her. On the next Thursday night she got away from him and ran off, but was afterwards brought back. It appears by the testimony of this witness that there was a child of the defendant, three or four years old, living at her mother's.

P. Sparks, for the State, testified that he captured the defendant after her escape from Cole, and brought her back to Waco. She did not seem sick when he found her, which appears to have been but a very few days after her escape. Witness had employed the defendant and said she was a good worker. She had supported the child still living at her mother's, and had taken care of another one which had died of fits.

Dr. Tate, for the State, testified that in March, 1879, the jury of inquest called on him to examine the body of a negro child found near his house in Robinsonville. He cut into the body and took out a piece of the lung about as large as two of his fingers, threw it into a pan of water, and it floated. This being sufficient to satisfy the jury, he made no further examination. The child was evidently a full-termed child, would probably have weighed seven or eight pounds, and had a full head of hair and growth of nails. The test made by the witness, taken with the other evidence at the inquest, satisfied him that the child had breathed, and that the string was tied around its neck after complete birth. There was a domestic string wrapped twice around the child's neck, and tied tight in a hard knot at the back of the neck; "from which fact," added the witness, "it might possibly be concluded that the string was tied after the birth of the head and before the birth of the rest of the body." The string pressed into the flesh, but witness observed no swelling or congestion of the face. The child was not decomposed, but something had eaten part of the cheek. The string was tied tight enough to have strangled the child, but witness could not say positively whether it was tied on the child before or after complete birth. Witness observed no signs of strangulation, which are swelling of the face and protrusion of the tongue and eyes, but these signs would be less observable in a negro than a white, and less in a child than an adult. The test applied by witness is called the hydrostatic test, and is the best

known to medical science in determining whether air has entered the lungs. It is not infallible, there being other conditions which will produce a similar result, such as artificial inflation, emphysema, and putrefaction: Witness noticed no emphysema, and artificial inflation is usually effected with instruments. There were no signs of the use of instruments in this case. In the absence of indications to the contrary, the hydrostatic test is almost conclusive that the child had breathed. Witness was confident that this child had breathed either before or after birth, but could not say whether before or after, nor whether the string was tied around its neck before or after its birth. Still-born children always have their eyes closed, and if a child was killed in its mother's womb, its eyes would be closed at its birth. The color of this child's lungs was red, and this was an indication of life. If they had no air in them they would have been dark. Lungs will not float unless air had entered into them. Generally the head of a child is born first, and with the face downwards; from which it might in the present case be concluded that the string was tied before the complete birth of the child; but, considering a woman's pains in such an emergency, it was hardly probable. The interval between the birth of a child's head and its complete birth is variable from a few seconds to a much longer time.

Dr. J. S. Willis, for the State, testified that he was county physician in March, 1879, and in that capacity went to see the defendant at her mother's, seven or eight miles from Waco. Defendant bore evidence of recent confinement, and was affected with inflammation of the womb incident to exercise after recent confinement. Witness made a digital examination of the womb, and is positive that she had very lately given birth to a child. This was a day or two after the dead child was found at Cæsar Williams' house. This concluded the evidence for the State.

The defense introduced Dr. Park, who stated that the

hydrostatic test is accurately made by putting the whole of the lungs in water, to see if they would float. Next, portions about the size of two fingers are cut from different parts of the lungs, to see if they will float. Then these pieces are cut up, to see if the pieces will float, and whether bubbles rise when they are squeezed under the water. Notice should be taken whether the pieces crepitate when pressed, or even when only sufficient pressure is used to lift them up. If they float and crepitate under these circumstances, the test gives evidence of air in the lungs, and that they have been inflated by breathing. The breathing may have taken place before complete birth, as well as after, and the test is incapable of indicating when the inflation took place. Even when properly applied, the test is not infallible, but it is the best criterion known to the medical profession. If the child breathed before complete birth, and when or even before the head was expelled, the phenomena afforded by the test would be the same as if the breathing had occurred after complete birth. As soon as a child is born, it generally cries, and this is its first act, and one which it cannot accomplish without having air in the lungs by breathing. It can cry before complete birth, with the head only out of the vulva, or even before the expulsion of the head. Instances are recorded where children have cried in the womb, but only when the vagina had been opened by the hand or otherwise. In such a case the lungs of a child, if it were killed before complete birth, would give the same results as if complete birth had preceded death. As a rule, and with the best attention, one child dies in every twenty to twenty-seven births. The fatality is still greater in cases of illegitimacy; the ratio in which is one in fifteen or sixteen. Negroes have children easier than whites, and with less danger to their offspring. In negroes the signs of strangulation are less observable than in whites, and less in children than in adults; but the

signs, which are congestion of the head and face and protrusion of the eyes and tongue, are always present in strangulation. As a rule the body of a child follows the birth of its head within two or three minutes, or half an hour, but the witness did not consider a labor of four to six hours a long one. A child is usually born with its face towards the mother's back, and generally begins to breathe the moment the head is expelled. Taking such a case as Dr. Tate had stated in his testimony, it was the witness' opinion that the defendant's child came to its death from strangulation caused by the string around its neck. Women sometimes get through labor with but one pain, and a negress would be more likely to do so than a white woman, particularly if she had previously had children. In the witness' experience he had known but one such case.

Dr. Manning, for the defense, testified that he had heard a child cry in its mother's womb before even the head had been expelled, and though no hand, instrument, or other appliance had previously been used in disturbing the parts or aiding the birth. He had experienced but one case of the kind, but others are recorded in medical words.

C. Stubblefield, for the defense, testified that the defendant had been in his employ prior to about March 20, 1879, when she came to him and said she was. pregnant and would soon be confined, and that he would have to get another servant. Thursday morning, the day before he settled with her, she was occupying a room with one Emma Davis, a negro woman who was subject to fits. Witness, hearing a noise before day, went into the room and found Emma in one of her spells. She had hold of the defendant, who was badly frightened. Witness separated them and returned to his own room, but, soon hearing the noise again, he went back to their room and found the two women in a violent scuffle. Witness sep-

arated them again, and, while he was trying to hold Emma, the defen ant started to run out of the room, but fell down the steps after reaching the door. There were three or four steps to the door. Witness stated that the defendant was a good servant. Instead of trying to conceal her pregnant condition, sh₃ told him that was her reason for leaving his employ, as she desired to go to her mother's to be confined.

The foregoing is in substance, though somewhat abbreviated, the statement of facts as presented by counsel to the trial judge, who, in his certificate, made some additions. The most material of them were that Dr. Tate testified to the crepitation of the child's lung, and to the absence of decomposition; and that Dr. Park did not state that in every case of strangulation all the signs were present, nor that the tongue was always protruded.

Though this court reverses the judgment of conviction on questions of evidence, it will be observed that it sustains the charge given to the jury by the court below, and quotes so much of it as appears to be necessary here.

*C. B. Pearre* and *Herring, Kelley & Williams,* for the appellant. The court erred in refusing to charge the jury as asked by accused, " To constitute a human being in the view of the law, the child mentioned in the indictment must have been fully born, and born alive, having an independent circulation and existence separate from the mother, but it is immaterial whether the umbilical cord which connects it with its mother be severed or not."

The question upon which hinges the proof of appellant's guilt is embodied in this charge. Only reasonable creatures *in being* are subjects of murder. Such creatures are *in being* when wholly *born alive.* The *extent* of birth is defined by our Code to be *actual* birth. The court below, recognizing the necessity of explaining to the jury what *actual* means, our Code being silent, very properly goes

to common law authority and draws therefrom the accurate idea of *complete expulsion* of the child from the body of the mother. If this had not been done the jury would have doubtless thought, as even one of the expert physicians did, that the protrusion of any part of the body of the child was *birth*. The court realized the necessity of defining this technical expression, and warned the jury not to stultify themselves by finding *birth* to mean the partial parturition vulgarly considered birth. Why the court did not think fit to advise the jury on the other element of the technical expression *in being*, cannot be imagined. *In being* includes *birth* and LIFE. The court could not define *birth* from our Code; for no attempt is there made to do so. Access was had to the old law, sustained by a long line of authorities and decisions for its explanation, and, when found, was very sensibly followed.

For the definition of life, the Code being again silent, resort must be had to the same source, which says it is where parturition has been completed and respiration and circulation of the blood independent of the mother begun. 1 Wharton's American Criminal Law, § 748; *Rex* v. *Enoch*, 5 C. and P. 539; *Rex* v. *Trillor*, 1 C. and M. 650; 3 Greenl. Ev. § 136; 2 Wh. and St. Med. Jur. part 2, p. 1081, § 1209; Taylor's Med. Jur. 346; Dean's Med. Jur. 140, and cases cited on pp. 141 and 188. Also and especially see *State* v. *Winthrop* (43 Iowa, 517), 22 American Reports, 257.

Erskine, J., in *Rex* v. *Trillor*, above cited, said: "If you are satisfied this child had been wholly produced from the body of the prisoner alive, and that the prisoner wilfully and of her own malice aforethought strangled the child after it had been so produced, and while it was still alive, and while it had, according to the evidence of the surgeon, *an independent circulation*, I am of opinion the charge is made out." To make out the charge, according to the old common law, an independent circulation must

be proven.   A child is not a creature in being until it has been wholly born, born alive, and a circulation of the blood independent of the mother set in.

We are told by the medical experts that a child may breathe before birth, or may be born alive and live for a greater or less length of time without breathing, after which it has been known to breathe and live; that, in other words, varying phenomena are observable in and immediately following parturition.   From this uncertainty a rule of law must be evolved, some definite, prescribed rule, by which it is to be determined what should, in criminal and in civil proceedings, constitute being born alive. Criminal and civil proceedings are contrasted, for the reason that the rule of law in one differs from that prescribed for the other.   "In a celebrated case of tenancy by courtesy *(Fish* v. *Palmer,* 1806, post-birth), the judges of that time held," says Taylor's Medical Jurisprudence, 346, "that the quivering motion of a lip after birth, without respiration, independent circulation, or any other sign of vitality, was sufficient to show that the child was born alive, and that it had thereby acquired civil rights, which it could transmit to others,— its heirs.   Why is proof of independent circulation in a child to be demanded of medical witnesses in a case involving a question of its murder, when, in respect to its acquisition of civil rights, such proof is not called for?"   If attention is directed to the child alleged to have been murdered, there would seem to be no good reason for paying greater seeming respect to the protection of its rights of property than of its right to personal security.   But such is not the object of inquiry. The criminal law, unlike the civil, does not undertake to redress any wrong inflicted on the dead child, but to protect society and throw around its alleged murderer all the safeguards necessary to a fair trial, in which her presumed innocence must be rebutted by evidence establishing her guilt beyond reasonable doubt.   In civil causes touching

the rights of property, the preponderance of evidence must decide the issue. For the quiet and the well-being of social order, either the plaintiff or the defendant must be granted the matter in dispute, and to attain that end it is necessary to be guided by this rule. Hence the law that the preponderance of evidence should turn the scale to the credit of him who, in a right pertaining to courtesy, could introduce even so slight a circumstance as the tremor of a lip, or the contraction of a muscle, in support of the justice of his pretensions.

Far different is the rule in criminal prosecutions. In the one case the jury are left free to weigh the evidence adduced, and by the most delicate distinctions pass between their fellows and mete out their respective rights. In the other, knowing the varying phenomena of childbirth, the law hedges the possibly innocent defendant with thoughtful, precautionary guards, by which the benefits of doubts are legally solved in her favor. With this object in view, a presumption of law exists, and is clearly enunciated in all the authorities to which access has been had, that proof of independent circulation must be established before, as Justice Erskine says, "the charge is made out."

Following these precedents, 1 Wharton's Amer. Cr. Law, § 748, says: "The weight of authority now clearly is, that in cases of alleged infanticide it shall be clearly proven that the child had acquired an *independent circulation* and existence, and it is not enough that it had breathed in the course of its birth."

Being referred by our Code to the principles of the common law, where our statutes are silent, we might confidently rely on the quotations already made — certainly upon the opinion of Mr. Wharton, just cited — to establish the law as set forth in the charge asked by the defendant, and refused by the court below. However, "to make assurance doubly sure," reference is had to *State* v.

*Winthrop* (43 Iowa, 519), 22 American Reports, 257, where may be found the identical charge asked by defendant, and in substance, the deficient, not to say erroneous, instructions given on the trial of the present cause. The judgment was reversed on this identical ground, and an able discussion of the law embodied in the opinion, fixing the rule and freeing Iowa from that uncertainty which is ever deprecated in the jurisprudence of any society. In reversing this cause on the present appeal, it is respectfully urged that the court express an opinion on this point, that the defendant may have the benefit of the legal protection which has been heretofore denied her. In *Winthrop's* case the court below seems to have assumed that a child may have independent life without respiration and independent circulation of the blood, and such was the view of the court below on the trial of this cause. The attorney general, in *Winthrop's* case, denied the possibility, but thought the existence of life presumes the existence of respiration and independent circulation. On the one hand the court below supposed independent life could exist without independent circulation; on the other hand the attorney general supposed proof of life carried with it proof of independent circulation. The first idea is held to be erroneous; the second, to declare a truth of no importance, since there is no means of proving life in an infant, never seen alive by witnesses, except by first proving independent circulation.

A child has actual independence of its mother when it has the adult circulation of the blood after complete birth; it has *potential* independence when it exists only through the *fœtal* circulation, though completely born. It is not yet independent but lives through its mother; *is a part of her.* But when adult circulation sets in, the umbilical cord ceases to be the channel for the transmission of the life-sustaining element, and the blood takes an entirely different course in the body of the child,

confining itself to the child, and no longer returning to the *placenta.* Whether the cord be severed, or not, in this state of the circulation matters not, the child being actually independent; whereas before, it was only potentially independent. Hence, a child which has been completely born but still has only *fœtal* circulation may have power to establish new life upon its own resources antecedent to the actual enjoyment of this new life. The court below seemed to think the killing of such a child would, and could be proven to be, murder.

Adams, J., in Winthrop's case, cites approvingly *Rex* v. *Enoch*, 5 C. and P. 539, as follows:

"The child might have breathed before it was born, but its having breathed is not sufficient life to make the killing of the child murder. *There must have been independent circulation in the child,* or the child cannot be considered alive for this purpose," though in civil actions the rule would be different.

In *Regina* v. *Trillor*, 1 Car. and M. 650, Erskine, J., in charging the jury, said: "If you are satisfied that this child had been wholly produced from the body of the prisoner alive, and that the prisoner wilfully and of malice aforethought strangled the child, after it had been so produced, and while it was alive, *and while it had an independent circulation of its own,* I am of the opinion the charge is made out against the prisoner."

3 Greenleaf Ev. § 136, says: "To support an indictment for infanticide, at common law, it must be clearly proved that the child was wholly born, and was born alive, *having an independent circulation* and existence.   .   .   . Neither is it material that it is still connected with the mother by the umbilical cord, if it be wholly brought forth and have an *independent circulation.*"

1 Wharton Amer. C. Law, § 748, says: "The weight of authority now clearly is that in cases of alleged infanticide it shall be clearly proven that *the child had acquired*

*an independent circulation and existence, and it is not
enough that it had breathed in the course of its birth.*"

"It may be asked," continues Adams, J., in Winthrop's
case above cited, "why, if there is a possibility of inde-
pendent life, the killing of such a child might not be mur-
der? The answer is, that there is no way of proving that
such possibility existed, if actual independence was not
established. Any verdict, based upon such finding, would
be the *result of conjecture.*" The jury should have en-
joyed the guidance of this clear rule of law in their delib-
erations on this complicated subject.

*Horace Chilton*, Assistant Attorney General, for the
State.

HURT, J. The appellant was tried and convicted for
the murder of her infant child, and her punishment
assessed at confinement in the penitentiary for the term
of five years. The indictment charges that the child was
a female. The defendant moved for a new trial upon the
ground that the evidence did not support the verdict.
We have carefully examined the statement of facts, and
found no evidence in support of the allegation "that the
infant was a female." This averment being descriptive
of the child, it must be proven. It is unnecessary to cite
authorities upon this proposition; they are almost unani-
mous in its favor.

Counsel for the defendant, in their brief, desire an
opinion of this court upon a question which appears in
this extract from their brief: "Repeated trials of this
cause have resulted in three convictions and one hung
jury. Two appeals have been already prosecuted and as
many reversals had. During the whole progress of the
case, however, there has been a difference of opinion on
the part of the court below and counsel for the defense
touching the law bearing peculiarly upon the crime of
infanticide, as set out in the charge and marked exhibit

B.   From this difference of opinion, to a great degree, has resulted a persistent defense, which has been based upon the theory that the State is required to prove, in prosecutions for infanticide, that there had existed in the child alleged to have been killed a circulation of the blood *independent* of the *fœtal circulation*, and independent of the mother.   The discussion of the question has been *evaded* in the opinions of this court heretofore rendered, reversing former judgments.   It is believed that a definite settlement of the proposition of the law above enunciated will result in a virtual acquittal of the defendant, and the removal of the cause from the docket of the court below, which has unnecessarily entailed no little expense upon the county."   If we comprehend the counsel, we will try not to evade, but to solve the very difficult proposition propounded.

"Homicide is the destruction of the *life* of one human being by the act, agency, procurement or culpable omission of another."   The human being whose life is destroyed, of course, must be living.   But, as a child lives in its mother's womb, and as the destruction of its life while thus living may be held homicide, our Code provides that "the person, upon whom the homicide is alleged to have been committed, must be in *existence* by *actual birth.*"   Penal Code, art. 545: This evidently means a complete expulsion of the child from the body of the mother, alive.   Being thus expelled, and living, it is then and not till then the subject of homicide.

No witness being present, and the State having to rely alone upon circumstantial evidence, what evidence can and must be adduced to show life after actual birth, as above explained?   Right at this point, if we understand counsel, it is insisted that proof of an independent circulation must be made, and that it (independent circulation) does not follow from proof of respiration.   Let us concede, for the sake of the argument, that to be a creature

in being, separate and independent of its mother, the child must have an independent circulation; is not proof of respiration conclusive of independent circulation? We think so. Therefore it follows that if respiration is shown after birth, independent circulation is also established. Writers upon this subject, it is true, speak of the necessity of showing independent circulation; but it will be found that circulation is not questioned by a respectable authority if the child is shown to have breathed after birth.

The relation which subsists between the circulatory and respiratory systems of the new born child, and the dependence of the former upon the establishment of the latter, have been settled beyond surmise by the researches of physiologists and accoucheurs. Immediately after its birth, and under the operation of influences not well understood, the infant breathes, and, the hitherto compressed air tubes and cells becoming distended with atmospheric air, expands the chest. The first act of respiration is described as exercising a *suction* force, by which the blood is directed from the channel through which it had flowed before birth, and is drawn to the lungs by means of vessels designed for that purpose. The first breath drawn by the child after its birth determines the circulation independent of its mother. The act of breathing is held by all physiologists and accoucheurs as constituting incontrovertible evidence of the individual existence of the infant, and, therefore, the accomplishment of its independent circulation. In support of these propositions we cite the following authorities: Marshall's Outlines of Physiology (edition of 1868), p. 980; Dalton's Treatise on Human Physiology, 5th edition, p. 704; Foster's Physiology, edited by Reichert, 3d edition, p. 923; Flint's Physiology of Man (1874), Vol. 5, p. 442; Carpenter's Principles of Comparative Physiology, 4th edition (1854), p. 291; Gray's Anatomy, Descriptive & Surgical,

5th edition, p. 768; Wilson's Human Anatomy, edited by Gobrecht (edition of 1858), p. 594; Theoretical & Practical Midwifery by Caizeaux, annotated by Fornier, 6th Am. ed. by Bullock (1875), p. 235; Leishman's System of Midwifery, 2d edition, edited by Parry (1875), p. 138; Playfair's System of Midwifery, edited by Harris, 2d edition (1878), p. 120; Principles and Practice of Obstetrics, by Bedford, 4th edition (1874), p. 264.

But we are here met with the argument that as the child may breathe before its head emerges from the pelvis of the mother, and as there is no birth until complete expulsion from the body of the mother, the breathing or respiration test stops short of proof of an independent existence. Scientific researches have pointed out the means by which it can be determined whether the child breathed before or after emerging from its mother. Should an effort to respire take place while the head is still within the pelvis, mucus and not air would be drawn into and fill the air cells; and upon a *post mortem* examination the lungs would disclose the exact nature of such a case. The mucus in the lungs would necessarily be discovered. If, however, a skilled accoucheur, in a case of difficult and continued labor, were to insert his hand for the purpose of rendering assistance to the child thus endangered by protracted labor, and the child were to respire by means of the aid thus rendered, the *post mortem* examination would not yield any evidence, under these circumstances, as to whether there was respiration before or after birth. But as the mother can never perform this operation upon herself, this obstacle in the way of the test, above stated, will not present itself in a case of infanticide. But notwithstanding all this, it is necessary that the child should have been completely expelled from the body of the mother, and alive; the proof must show this fact.

The respiration test can never determine whether the

child breathed after the expulsion of the head, or full and complete birth, for we have found the test to be the condition of the lungs; that is, if they show atmospheric air and not mucus, we are to conclude that the breathing occurred either after *complete* birth, after the *head* was expelled, or under the circumstances above stated, when relief is extended by the accoucheur. Here then we are brought by the logic of these facts to a gap,— a hiatus in the proof,— which cannot be bridged over by physiological research. Let us restate:—"The child must be expelled completely from the mother, alive, before being the subject of homicide. This being a case of circumstantial evidence, resort is had to the condition of the lungs. They show evidence of having breathed atmospheric air. This may have been done while passing from the pelvis, after the expulsion of the head and before *complete* birth, and it being *necessary* for the proof to *meet* that *fact*, hence, under the facts of this case, arises this insurmountable difficulty." Greenleaf on Evidence, vol. 3, § 136; *State* v. *Winthrop*, 23 Iowa, 519; *Regina* v. *Trillor*, 1 Carrington & Marshman, 650.

Mr. Justice Parke seems to hold in *Rex* v. *Enoch*, 5 Car. & Payne, 539, that there may be breathing and yet no *independent circulation*. This we cannot concede. But it is believed that the idea sought to be conveyed by the learned judge is that, as there may be breathing before actual birth, the circulation of the child, though not through the umbilical cord, would not be independent; because of the child's not being completely expelled from the body of the mother. For we hold that, though the condition of the lungs can never determine whether the child breathed before or after full and complete birth, yet, independent circulation in its proper sense follows breathing. See authorities above cited upon this subject. The umbilical cord need not be severed in order to establish a circulation independent of the placenta. On the other hand

cases have been cited in which a child has been wholly severed from the mother, and respiration has not *apparently* been established until after the lapse of several minutes of time; and the learned judge in the case of *State* v. *Winthrop* concludes that during that time there must have been an independent circulation. This would have been physically impossible,— in direct conflict with the physiological organization of the child. Nor, if true, would it follow that circulation did not invariably and instantly follow breathing.

We are of the opinion that independent circulation is proved by breathing; but, be this as it may, it being absolutely necessary to prove that the child was completely expelled from its mother, and that, after being thus born, it had an independent existence,— that is, that the child breathed, and its blood circulated independent of its mother,— before it can be the subject of homicide; and as the breathing test cannot determine whether the breathing occurred after complete birth, or after the head was expelled and before full and complete birth, a determination of the truth or falsity of the above apparently conflicting positions is unnecessary; the respiratory test being unable to reach and grapple the question, to wit, was the breathing after full birth, as above defined, or after the expulsion of the head and before complete birth? And as the facts in this case render it quite possible for the string to have been placed around the neck of the child after the appearance of the head and before full and complete birth, it becomes imperatively necessary for the attention of the jury to be plainly and directly called to the case as made by the evidence upon this fact and the physiological facts. Was this done by the court below? We think so.

Upon this subject the learned judge charged the jury that "Homicide is defined as the destruction of the life of one human being by the act, agency or procurement, or

culpable omission of another.   The person upon whom the homicide is alleged to have been committed must be in existence by actual and complete birth."   And also: "In order that a child be in existence by actual birth, the parturition must be complete, and the body of the child must be expelled from the mother, and it must be alive, having an independent existence; so that the destruction of vitality in a child, before it is completely born, or the doing of any act before it is completely born, which causes death after the birth, is not a homicide, however culpable, or under whatever circumstances, or with whatever intent done.

"But if a child be wholly born alive, however frail it may be, and however near extinction from any cause, and another person inflict upon it any violence intentionally, by means or in a manner ordinarily calculated to cause death, which cause contributes to or hastens its death, such person is guilty of homicide.

"If you believe from the evidence before you, beyond a reasonable doubt, that the defendant, Sallie Wallace, did give birth to a female child, at or about the time alleged in the indictment, and in the county alleged; that said child, if any, was born alive and in existence by actual and complete birth, as the same has been explained; and that at or about the time alleged, and in the county alleged, and after said birth, if any, and before the indictment was presented, the defendant, Sallie Wallace, did violently and intentionally, and by the means and in the manner alleged kill said child," etc.

Also: "If you believe from the evidence that defendant did give birth to a child as alleged, and that said child did possess vitality before it was born, and that before it was completely born she destroyed the vitality of the child, or before it was born inflicted violence upon it of which it afterwards died, you will acquit the defendant, whatever may have been her intention, as in such case

the destruction of life would not be a homicide; and if you believe there was a child so born, and that its vitality, if any, was destroyed by violence inflicted by defendant, but in view of all the evidence you have a reasonable doubt as to whether the violence was inflicted before complete birth, or before actual existence after birth, or have a reasonable doubt as to whether such violence, if any, was inflicted with the malicious purpose to destroy the life, if any, you will find the defendant not guilty."

By this charge the jury were told, in a plain and excellent manner, that there must be a complete birth,—independent existence,—to constitute a subject for homicide. It is true that the judge did not tell the jury that, to establish this independent existence, there must be evidence of breathing and an independent circulation. These were matters of evidence. These facts constituted the evidence of the independent existence, and we will presume that the jury were possessed of a sufficient amount of common sense to deal with and solve the issue. To us it appears that the principles contended for by counsel for defendant were fully recognized by the judge, and correctly applied in his charge.

Let us, however, return to the logical conclusion forced upon us by the facts and principles of this case, which are formulated in the question: Is the verdict of the jury supported by the evidence? Do the facts, viewed under the light of the above principles, show that the life of the child was destroyed after complete birth? Where, in the whole range of facts, is it not shown that the violence used was not inflicted after the head of the child was expelled and before a complete birth,—before an independent existence was established? What evidence fills the vacuum? Must the reasonably possible fact be ignored, that all shown to have been done by defendant may have occurred after the head had been expelled and before actual birth,—before an independent existence?

The *post mortem* examination made by the physician fails to reach and solve this question. The law requiring that the person charged to have been killed must be in existence,— living, with an independent circulation,— with all of the vital organs in operation separate and independent of his mother, before he can be the subject of homicide, the proof must clearly and satisfactorily show a person with just such an existence, before a party can be found guilty of culpable homicide. Nor is this court to take into consideration questions of good or bad policy. We are to pass upon acts made penal by the law of the land, and it is our duty to see that every constituent element and necessary ingredient of the offense be reasonably and satisfactorily proved. In this case we are of the opinion that the evidence fails to establish the independent existence of the child at the time the violence was inflicted, if any. 3 Greenleaf's Evidence, § 136. We are not to be understood as holding that there may not be cases in which the evidence or proof resulting from a *post mortem* examination, though imperfect within itself, may not be so supported by the surrounding facts as to justify a conviction in purely circumstantial cases. The investigation may leave it in doubt whether the violence was inflicted before complete birth; but, taking the fact that the child respired, though uncertain when, in connection with the character and extent of the violence inflicted, a case may be clearly and conclusively proved.

The record fails to show that the child was a female, and failing to support the verdict on the main point, the judgment must be reversed and the case remanded.

*Reversed and remanded.*